United States v. Kelly All right. And is it Ms. Bonjean or Bonjean? How do you pronounce your name? Bonjean. Bonjean. Yes. All right. Ms. Bonjean, you have reserved three minutes for rebuttal, so that gives you seven minutes out of the gate. Thank you. You may proceed. May it please the Court, my name is Jennifer Bonjean and I represent Robert Kelly. Like every RICO indictment seemingly in history, the government charged the defendant with being the member of an enterprise that had a common purpose of carrying out an illegal or illicit activity. Well, I guess I'm trying to understand, are you challenging the jury instruction, which didn't say that the RICO enterprise had to have an illegal purpose? No, Your Honor, I'm not challenging the jury instruction, nor could the jury instruction be challenged. The jury instruction is entirely consistent with United States v. Boyle. In fact, it's almost word for word the same jury instruction. And in Boyle, as this Court may recall, where the enterprise or the instruction was challenged, even though it wasn't set out with specificity what the structure of the enterprise should be, the Boyle court said, that's fine. It doesn't have to be, the jury doesn't have to be instructed with that level of specificity. In this case- But you're arguing, it seems to me, that absent an illegal purpose, there can be no RICO enterprise. Yes, because it would make nonsense of the statute. Okay, but I guess, A, what's the authority for that? And B, isn't that really a challenge to the jury instruction? I don't believe it is. I think that- Well, did the district court tell the jury that they had to find an illegal purpose so there could be no enterprise? No, but the indictment did, and the indictment was incorporated into- But the indictment listed a series of purposes. Yes, a series of purposes pled in the conjunctive, and the jury instruction, which had the indictment incorporated into it, pled that there were four different purposes, two of which were illegal, legal essentially, and two which were illegal. All right, but I guess I'm asking a basic question to start, which is that if the government had just listed the legal purposes, your view is that that would not be sufficient for a RICO indictment. No, in fact, district courts routinely dismiss complaints that do not demonstrate that the purpose of the enterprise is illegal in nature. In fact, neither party has been able to find a single case where the purpose of the enterprise was entirely legal. Are you saying that there was insufficient evidence here to prove an illegal purpose? Correct, or illicit, or fraudulent, or some type of- Wasn't there substantial evidence? No, Your Honor, I respectfully disagree. There was substantial evidence of- Please hand it to me. Yes. There was substantial evidence, perhaps, of defendant's wrongdoing in the context of using, quote unquote, the machinery of his organization, his entourage, those types of individuals. But there was very little evidence, almost certainly not sufficient to meet the government's burden of proof, that any of those individuals acted with this common purpose to, quote, recruit women for Mr. Kelly for illegal sexual activity or for the production of child pornography. So I'd like to just make sure I understand. It sounds to me as though you're making a legal argument that a RICO enterprise has to have an illegal purpose, as well as that here, an illegal purpose was charged, but there was insufficient evidence of it. Yes, Your Honor, that's correct. That is precisely right. And I want to understand, in light of Turquette, why we have to find an illegal purpose as well. I mean, there's language in Satinwood in most of the cases that have been cited and discussed are in the context of a fraudulent purpose that may have some legitimate enterprise around it. But there's room for confusion there. But Turquette seems to say quite directly that the term enterprise, as used in RICO, encompasses both legitimate and illegitimate enterprises. So maybe you can help me. Yes, the issue isn't whether it was a legitimate organizational legal entity versus a non-legal entity. Turquette held, and the question before Turquette was the exact opposite, whether a RICO enterprise could be exclusively criminal, not whether it could be exclusively legal. And our position is that this was an organization that the government failed to prove had any criminal purpose. The government takes the position that for a RICO enterprise to exist, it need not be rooted in criminality at all, which would fly in the face of Turquette, frankly. Turquette looked at Congress' intent, both the statement of- And didn't the government prove that one of the purposes of this enterprise was to recruit girls so that Kelly could have illegal sexual activity with them? They pled it. They did not prove it. What they did prove is that through the course of a period of time, there were perhaps efforts to pass along information, a phone number, to invite someone backstage. There was no evidence presented that any of those individuals did so, believing or knowing that someone was underage, that you go to a big concert, there are 17-, 18-, 19-year-olds. Even the victims themselves said, well, nobody asked me for my age. When the age came about, perhaps Mr. Kelly may have known, and that's what I think some of the women testified to. But there was no evidence that anyone went out there saying, may I find out what your age is? Are you underage? Come back. We want to serve you up to Mr. Kelly. That just didn't happen. And, in fact, there is extraordinary evidence that the members of the enterprise, again, these are some of the people, I guess, that testified, repeatedly made it clear that what happened behind closed doors was not something they understood. Yes, there were rules and things they did, these anodyne tasks that were perhaps a little unusual, but not that put them on notice that what was happening behind closed doors was illegal. And we are talking about matters that happened behind closed doors. The fact that a video recorder existed in a bedroom does not ipso facto make it evidence that there is trial pornography being produced. You're saying these other individuals didn't know that these girls were underage? That's exactly what I'm saying. I think the evidence that was presented to the jury was deficient in that regard, that there was so much excessive evidence, frankly, about Mr. Kelly's wrongdoing, that it would be easy to be tempted to go down the path, well, everybody must have known. But that is just not what was demonstrated at trial. Well, the appearance of these girls would be evidence enough, wouldn't it? These were not 12-year-olds. These were not 13-year-olds. What was testified to is that some of them looked young. And having multiple teenagers myself, looking young, does not mean you know someone is a minor. And the question becomes, did they have an obligation to ask? Did they have to do due diligence, do inquiry, when he said just go pick somebody up? Again, just using individuals, unwitting individuals, who perhaps even turned a blind eye or who didn't inquire further, does not a RICO enterprise exist. And I would leave with this point that simply speaking, I mean, I won't leave with it, but the law presumes in Turcotte, which was an entirely criminal enterprise, entirely criminal enterprise, they weren't speaking to the question of whether it could be a legal enterprise with a one man doing illegal acts in the context of the enterprise and using his employees. So Turcotte does not, from where we stand, put this issue to rest. And what the government wants to do is simply read out of the statute organized crime. And at the end of the day, the statute- They want to read out organized crime? Yes, because the purpose of the statute, the RICO statute, is to address organized crime. It's not in the text, though, right, when you say read it out.  And in fact, courts have universally read organized crime very liberally, very broadly. And we're not quarreling with that. But you can't just have an organization that is not associated with any crime. Simply speaking, a RICO enterprise is a criminal organization. You can define it broadly. But it's not an organization simply with a criminal. And that is what the government is asking the court to find here. I believe my time has expired. But you're not challenging the jury instructions. So you're agreeing that everything the district court told the jury they needed to find was correct, right? Your Honor, the jury instructions were consistent with every jury instruction ever given in a RICO case, historically. And frankly, it's consistent with what the United States Supreme Court held in Boyle. I don't know how- So the jury wasn't asked to read out portions of the statute. Again, I go back- The jury was correctly instructed. So I guess I'm trying to figure out. You're saying that the evidence didn't support the elements that were correctly instructed to the jury. What I am saying, Your Honor, is that the government had an obligation. And in fact, the jury was instructed that the government had to prove the theory of the enterprise. The theory of the enterprise included criminal conduct that was pled in the conjunctive. And if it had been just simply legal activity pled in that indictment, it would have been dismissed. Because routinely, again, and we cite numerous cases, as does the government, district courts simply do not allow RICO prosecutions or RICO suits to move forward where you don't have an actual fraud or illegal or illicit activity that is the moving force or that is the common purpose. This would be outside the realm of, again, contrary to the purpose. Back on the issue of whether the staff knew the age, sometimes the staff booked the travel arrangements for them. And therefore, they had to have identification documents. Isn't that evidence that they knew they were underage? I think if you look closely at the record, you will see that the government was very clever, frankly, of conflating these issues where I do not believe there was any evidence that the employee booked travel for someone who was, in fact, under the age of consent. So you have to remember, in Illinois, the age of consent is 17. It only becomes a federal crime if it's being videotaped. Now, do these people know what's happening in the bedroom? No. There is no evidence that someone- Was there evidence that the staff made sure that in his backpack he had his iPad- No. The evidence doesn't show that? It shows that people picked up his luggage. I mean, people pick up my luggage. I pick up other people's luggage. Am I responsible for what's in that luggage? It just takes this to the point of absurdity. We cannot say an enterprise exists because unwitting employees are engaging in normal tasks that they do, particularly for high-profile people. Thank you. Thank you. Ms. Bensing? May it please the Court. Assistant United States Attorney Kayla Bensing on behalf of the government. Good morning, Your Honors. I want to start with the defendant's challenge to his RICO conviction and what constitutes an enterprise. As the district court stated at the sentencing in this case, the defendant had a system in place that lured young people into his orbit, and then he took over their lives. And so I want to start with this claim that was made in the reply brief and is made today before the court, that the enterprise members or that the defendant used his inner circle to simply carry out anodyne activities. Demetrius Smith, the defendant's- What evidence is there in the record that the staff who arranged these things knew that they were underage? Yes, Your Honor. So in September of 1994, I'll start there with the victim, Addie, who testified. She testified that she was 17. She was invited by Kelly's bouncers to come backstage at a concert in Miami. That was three days after Kelly's marriage to Aaliyah, in which he bribed a county official in order to hide or alleviate the consequences of illegal sexual activity, and obviously members of his enterprise arranged for that bribery, and so were well aware of that illegal sexual activity. A few years later in 1998, Stephanie, who was the victim named in Racketeering Act II, was approached at a McDonald's by a member of Kelly's entourage. He asked how old she was. She told him that she was 16. Kelly's associate then gave her Kelly's phone number and said Kelly wanted her to call him. This is the same girl who at 17 was instructed by Kelly to give him oral sex in the backseat of a car and to be vocal and make noise while doing so, so that Kelly's driver and another individual who were present in the car could hear, which was obviously a deeply humiliating experience for her. Turning next to Nicholas Williams, he was one of the defendant's runners beginning in 2003. He answered phones and escorted Kelly's girlfriends inside of Kelly's studios, and he testified that Kelly's female guests were very young, keeping in mind that he was 19 at the time. He also testified that he could hear sexual activity and yelling between the defendant and his female guests. The jury is entitled to infer from that that Kelly's employees helped maintain and facilitate Kelly's contact, including sexual contact, with these underage women. I want to also turn to Anthony Navarro's testimony. He was another one of the runners employed by Kelly. Navarro, who started working for Kelly in 2007, specifically identified that he would help answer phones for Kelly's girlfriends. That was his word, and there was some claim in the reply brief that these were just female guests, but he testified using the word girlfriends. And he identified them as looking very young, specifically mid-aged teenagers. And the jury heard testimony from Duranda about how she recognized Navarro as one of Kelly's runners, who she interacted with when she was 16 years old being sexually abused by Kelly. In addition, there's Cheryl Mack. She was Kelly's assistant beginning in approximately 2013. She repeatedly saw Kelly with 17-year-old Jane. She had booked travel for Jane as early as April 2015, so she knew Jane's age. And a couple months later, in July of 2015, she testified that she observed Jane going to perform oral sex on Kelly. There's also Suzette Mayweather's testimony. She learned that Jane was 17 years old in the fall of 2015. She knew that Jane was one of Kelly's girlfriends. She observed her following all of the same rules as Kelly's other girlfriends. There's also testimony from Jane about Juice, who was another one of the defendant's girlfriends, but whom Jane testified acted as one of the defendant's assistants. Juice helped teach Jane rules, and Juice also knew Jane's age. I believe that's in the special, I believe that's Essay 527. So this is all evidence that the jury was entitled to infer that Kelly's inner circle knew what was going on, that he was recruiting and maintaining underage women for sexual activity. Does the, I guess the allegation that Kelly was also inducing these folks to come in violation of state law because he was infected, is there evidence that his entourage or the folks in the enterprise knew about Kelly's status as infected with herpes? Yes, there is. There's testimony that his assistants picked up his Walgreens records. Anthony Navarro, who was one of the runners, testified that he would pick up Valtrex for Kelly. That's at A467 to 68. Diana Copeland accompanied Anna, who was one of the testifying victims at the trial, to the hospital for her STD test, and only Diana Copeland received the results of that test, not Anna. Juice, again, who Jane testified was like an assistant to Kelly, took Jane. Was there evidence that the staff knew that Kelly wasn't disclosing his condition? Well, a number of the women, in fact, obtained, got an STD. They were not just exposed to it, but they, in fact, got an STD. That doesn't go to the consent question. I mean, if they consented, then it wouldn't be a violation of state law, right? If the girls had consented, knowing that he had herpes, that would not violate state law? Well, the state law, I believe the state law, the violation is specifically exposing somebody to an STD. The jury was instructed that R. Kelly did not also give consent in those, that they did not give consent in those circumstances, so that was part of the jury instructions. My question is, was there evidence that the staff knew that there was lack of consent? Well, I don't think that there was direct testimony on that, but I do think that a jury, drawing all inferences in the government's favor, was entitled to infer that from the evidence that did exist. And again, just to complete the record on that, about the testimony by Jane about Juice, that Juice took Jane to see a doctor in downtown Chicago, and she was prescribed medication for her herpes infection. I also, though, want to talk about another illegal sexual activity for which there is tons of enterprise evidence that Kelly has not really raised on appeal at all, and that is forced labor, that the defendant obtained labor and services here, sex acts, through threats of serious harm or physical restraint against the victims. And the evidence is replete with examples of how tightly tied the forced labor charges and the predicate acts were to the enterprise. So I'm a little concerned about applying the forced labor statute in this context, because it seems that you run the risk of really federalizing all kinds of state sexual assault and being able to turn it into federal offenses with much different consequences for the individuals. Can you address that concern? Yes, of course, and I would just return the court to the plain language of 18 U.S.C. Section 1589A, which prohibits whoever knowingly provides or obtains the labor or services of a person by any number of combination of the then subsections of that, which includes a scheme, plan, or pattern intended to cause the person to believe that if the person did not perform that labor or services, the person or person would suffer serious harm or physical restraint. So wouldn't that apply to any kind of rape prosecution? So I don't think the court has to reach the outer boundaries of what the statute may or may not apply to in this case, because there was a clear pattern that was far beyond something like a one-time rape. So for the specific victims, there were three cases. In some cases we are talking about just one or two instances, right? Well, I don't think so. So as to Duranda, what was charged was a specific instance as to the forced labor. But, of course, there was an entirety of the pattern that led up to that specific incident where he choked her, he spit on her, and then he made her perform oral sex on him. What led up to that was a whole series of Kelly enforcing his rules, teaching her the rules, enforcing the rules, and then punishing her. So you think we should focus on the actions that constituted the force as opposed to the labor that was forced? Well, I think as to labor and service under this court's definitions of those and recently in Marcus, sexual activity, I think, clearly falls within the definition of the expenditure of physical or mental effort, especially when fatiguing, difficult, or compulsory. The performance of work commanded or paid for by another. And, of course, in the context of prostitution, I think that the court would have no issue finding that that constitutes forced labor. And here this is no different. A sex act is a sex act. But what about a single one? What about a single rape? Well, again, I don't think that the court has to reach the question of sort of the outer boundaries of that question about a single rape. I guess what I would say is here the conduct has met the elements of forced labor, and I think even the district court noted in its opinion that this was the kind of case where the defendant had a pattern in place of making these women feel isolated and ashamed, and he used the enterprise to make them feel like they were confined and that they had no way out. There was an expert who testified at trial as well about the defendant's use of these isolations. Right, but the issue is the labor component, it seems to me. So what does the isolation have to do with labor? It might not be true, but where is there labor? Well, I am just pointing the court to the other portion of Section 1589, addressing the court's question as to whether a single rape could constitute forced labor. I think here sexual activity can constitute labor or services. Right, I know that. Ranieri says that. What about the facts here? This is very different than Ranieri, right? Well, I think in many ways it is similar. For example, the women were forced to give over collateral. Geronda, who was one of the victims of the forced labor charge, testified about how she had to write false letters. Faith also was forced to send a text message. Is that the labor? So writing false letters is the labor? No, the labor would be. Ranieri and these folks were doing other things. They were doing things for free that would be easily described as labor. Some of it sexual, some of it not. Well, again, I think that people pay money for work on websites, people pay money for transcribing tapes and reviewing articles, and people pay money for sex. So I think under the definition that this court has given in Ranieri. So I think that's where we're back again. You keep saying we don't need to go to the outer boundary, but it seems to me your argument is any sex act, including a rape, is forced labor. I believe that sexual activity does count under this court's definition of labor and service. And, again, I would just note that, of course, the other provisions of the forced labor statute would also have to be met. And that may be where there's a limiting principle in terms of whether a single rape would constitute forced labor because the whole other part of the statute would have to be met, which includes, as relevant to this case, the use of the means of any scheme, plan, or pattern intended to cause the person to believe that if they didn't perform the labor and services, that person or another person would suffer serious harm or physical restraint. And so that brings me back, I think, to sort of my initial point, which is, and I see that I'm over my time, so I can continue to address sort of the record evidence. Go ahead. There are a lot of issues here, so we may want to get to some others, too. Okay, so just very briefly, I think the record is replete with evidence that the enterprise was tightly tied to the facilitation of the forced labor predicate acts in this case. Members of the inner circle heard Kelly beating his girlfriends. They knew that Kelly was isolating his victims, and they helped him do it, including by enforcing his punishments, such as watching over them while they were confined to a bus for prolonged periods of time. There's testimony about that from the Mayweather sisters, from Diana Copeland. And employees were punished when they didn't comply. There were financial sanctions when they, for example, Copeland testified that she let Anna escape. And so I have numerous other examples of that, but if the court has questions about any of the other charges. I'd like to ask about restitution. Yes. And about it seemed to me that the record was weak that Kelly infected Jane and the second young woman with herpes in states where the exposure was illegal. And I wondered what the government's position is on that. If Kelly gained herpes in a state where the exposure was legal, someplace other than New York or California, do you agree that she would not be entitled to restitution? Well, I think the record here establishes that the first time that Jane had sex with Kelly, so her first exposure to the STD was when she was in California. And that was the basis for that particular racketeering act and for the charge as well. And so that was the first time that she was exposed. She subsequently, later that summer, tested positive for having herpes. And so I think that the record has demonstrated that the crime was exposing her to herpes, and there's direct causation that she then later contracted herpes. And just to close the gap, she also testified that she had not been with any other sexual partners at that time. So I think here we do have direct and proximate causation, and, of course, the district court had the facts to make that determination. And as to Stephanie, so she had filed a letter with the district court indicating that the defendant had exposed her with herpes, and that was part of the sentencing record. But in addition, the government had referenced a report of investigation, an interview that she had given to HSI agents that during the time that she was with Kelly, he never wore a condom. Let me go back. I'm sorry. I'm just looking at my notes. Yes. But wasn't by the time that Kelly met Jane, wasn't he on Valtrex by then? So the testimony was that, first of all, herpes can be transmitted even while you are taking Valtrex. That was part of the expert's testimony in this case. And there was also testimony that his use of Valtrex was very inconsistent. So there's testimony from his doctor that the doctor would prescribe 11 months of Valtrex, and then four months later he'd have to be prescribing more Valtrex. So I think there's testimony from which the district court could conclude that he was not taking Valtrex as it was prescribed, which simply increases even more the risk that he could transmit herpes to Jane. And this is applying a preponderance standard. Exactly. Of course, Your Honor. So if you could address Stephanie now. Yes. Thank you so much. So in this report of investigation from HSI, which the government referenced in its letter seeking restitution for Stephanie, we represented that the only person that she was with was Kelly at that time, and that was in 1999. Of course, in 2000, Kelly did have a negative culture for herpes, but there was testimony from both his doctor and the expert witness in this case that it is actually quite frequent that you might get a negative culture even when you have herpes  So that was evidence that she was having sexual relations with no one else? Correct. That was part of the report of investigation that the district court had before it. There was a specific 3500 piece that was referenced. Thank you. Can I ask you, I guess to come back to what I think is a legal point, do you agree with Ms. Bongean that there has to be a legal purpose in order to establish an enterprise, which is really the first element of the RICO claim? No. I think as we have made very clear in our brief, that is nowhere in the text of the statute, that is nowhere in the Supreme Court's precedent, and in fact there is precedent in this circuit that does not require any sort of a legal common purpose, and specifically the court's opinion in D'Addario, but also a recent summary order in this circuit in the Ranieri case. In that case, there was a completely legal common purpose that was alleged, and this court found that that was completely sufficient. And then I guess the next question is that I think Ms. Bongean's argument is that when you've decided to charge an enterprise with a list or a series of purposes, her view is you have to prove them all beyond a reasonable doubt, or you have to prove the enterprise in question. Well, the jury instructions, in fact, stated that the government is not required to prove each and every allegation about the enterprise or the manner in which the enterprise operated. The enterprise must be essentially the one that was alleged in the indictment, and for all of the reasons I started with today, the enterprise was the one that was alleged. Well, I guess that's the question. Is it essentially the one charged in the indictment if the jury only finds three of the four purposes proven beyond a reasonable doubt? Yes, I absolutely think that it is. It's not like there is some sort of unfair surprise that R. Kelly's enterprise was the Gambino crime family. I think if the court looks at the definition of the enterprise in the indictment, the means and the methods used by the enterprise, those were proved by the government at trial. And so I think that there is sort of no way on this record, and I can continue to go through the various factual allegations if the court was like, but I would also reference the court to the district court's very thorough opinion in this case as a place to look for the evidence of the enterprise, which was one, I think, that was alleged in the indictment. So I think under the factual record, there can be no doubt that the government proved that the enterprise was essentially the one alleged in the indictment. And nobody asked for a special verdict form that would have the jury identify which purposes were proven beyond a reasonable doubt. And nor, that's of course true, and I think that this argument has been thoroughly waived, including by the statements today, that the jury instructions were appropriate under both parties' position. But also, I think we're talking about the existence of an enterprise, and a common purpose is sort of one sub-element of what constitutes an association, in fact, enterprise. So I don't think that there need to be any sort of special verdict as to which common purpose was proved. Do you mean if they all thought that what they were doing was just promoting his brand in music, that the illegal purposes would be irrelevant to the enterprise? Well, so again, in Ranieri, there was a very similar common purpose that was alleged. It was to promote Ranieri and to recruit new members into the pyramid organizations. That was the common purpose that was alleged, and this court found that that was sufficient. Now here, the government alleged additional common purposes, and the government continues to submit that the proof at trial was overwhelming, and certainly that the jury's verdict should be credited. The criminality is picked up by the pattern of conduct. Correct, and also the required nexus between the person acting through the enterprise to commit a pattern of racketeering activity. All right, thank you very much. Thank you very much. Ms. Benson, we'll hear now from Ms. Bongean for three minutes of rebuttal. Thank you, Your Honor. I'll start really briefly with the forced labor issue. Forced labor counts were based on a single act in both cases, Jahanda, an act of oral sex, and in Faith, an act of oral sex. I know the government, again, keeps referring to all of the enterprise activity or the activity that they allege is enterprise activity, but at the end of the day, those forced labor counts were premised on a single act. So unless the court is prepared to say that a single act of oral sex, even if it's forced, frankly, constitutes forced labor, that is just making federal law coextensive with state law, and that is one of the problems with that argument, which we did raise in our opening brief. The government is taking the position that a RICO enterprise need not be rooted in criminality. That is what they are saying, and that is a new position that, frankly, is unique and not really supported, including by Daddario, where Daddario – Well, in Daddario, there was an estate that had to be administered, and there was nothing inherently illegal about that, right? No, but the court in Daddario did say in the context of after finding the estate to be an appropriate structure, the exact language was Daddario found that the individual defendants were alleged to assist the executor of the estate to effectuate his schemes. It was an estate that effectuated schemes, an estate that engaged in criminal activity. It was an estate that engaged in illicit activity. And so what the government is saying is, in this case, if we merely charged the defendant with an enterprise that's common purpose was simply to promote his music, that would have been A-OK. But I think that is – Why is that wrong if the government also has to prove a pattern of criminal activity, racketeering activity, and the next? Well, I think in Boyle, the United States – In other words, RICO is looking at organizations that are then used to commit criminal acts, and it doesn't have to be a criminal organization. It could be a completely legitimate organization, but if it engages in racketeering activity, then it violates RICO. Yes, but first of all, if you look at the racketeering acts, it's defendant Kelly's acts. Those are the acts that are charged. There are no acts except perhaps I guess we could make an argument about Demetrius Smith's conduct after he learned that there was illegal activity occurring with Aaliyah allegedly. He's a little much of an outsider, but overwhelmingly, and I think all of the racketeering acts involved the victims and the defendant, not the enterprise, the alleged enterprise. But I think you're conflating the fifth and the first elements of a RICO claim. The first is just the existence of an enterprise. It can be a labor union, right? Again, Your Honor, I'm not talking about the ascertainable structure. I'm talking about the structure still has- No, I'm not talking about the ascertainable structure either. I'm talking about the legal entity of a labor union is sufficient for an enterprise. Agreed. Agreed. It still has to have a purpose. No, the fifth element is that the defendant conducted or participated in the conduct of the enterprise through his previously established pattern of racketeering activity. So it has to be a link between what the defendant is doing as a pattern of racketeering activity and the conduct of the enterprise. That's the last element. You seem to be flipping that into the enterprise, and I think that's where you're getting confused. I don't believe I am. I think the United States Supreme Court in Boyle made it very clear that an enterprise has to be more than just the pattern of racketeering. It has to be- Yes, an enterprise has to be demonstrated. An enterprise is defined as an entity, legal or not legal, that has purpose, structure, and form. Right, and one of- And history. I'm sorry? And history. Yes, and one of the elements of the structure for an association-in-fact enterprise is a common purpose. Right, but not an illegal common purpose. Well, I mean, then we are- then- I mean, again, this is a new approach that would- I don't think so. Again, you didn't object to the jury instruction. I didn't try- I didn't represent Mr. Kelly at trial. No, I mean- Not you personally. But let me put- but I think that would have been a frivolous objection when every single- including the United States Supreme Court has said these exact instructions are proper. What has never come up is because the government has extended the RICO statute to a set of circumstances that's so beyond what the framers intended, which was to get organized crime. And now we're talking about an organization with an alleged criminal, but not organized crime. And it is not enough simply that there be a pattern of racketeering that satisfies the enterprise. There has to be something more. The pattern of racketeering can be proof of the enterprise, but it cannot simply be the only evidence of the enterprise. And I think if the court looks at the evidence closely, the government conflates a lot of the evidence that came in. But at the end of the day, we are talking about, in a couple instances, some of these victims that testified were very clear that no one asked me my age. And if you're 17 years old in the state of Illinois, it would not necessarily put anyone on notice that what's going to happen is illegal. It's preposterous to suggest that because a runner goes and picks up a famous person's medicine, that puts them on notice that Mr. Kelly is exposing and giving STDs to his partners. And for example, Cheryl Mack, as an example, she testified very clearly that when she saw some inappropriate conduct with Jane, she quit the next day. That is not evidence that she came together to participate in recruiting girls or producing child pornography. That's evidence that, whoa, this is not what I would approve of, and I'm out of here. So this shows that this was not a collection of people who had a purpose to recruit girls for sexual abuse or for child pornography. Whether they turned a blind eye, whether some of them suspected that some of these girls were underage, that's a whole different matter. And once we get into that sort of territory, where we're going to say that constitutes a RICO enterprise, well, we have a lot of organizations, we have a lot of frat houses, we have all types of organizations that are now going to become RICO enterprises. And that has not been the case. Frankly, if that was the case, it's unclear why Bernie Madoff wasn't prosecuted under a RICO theory, because he certainly was using the machinery of his organization to carry out a RICO enterprise, and yet he wasn't. So I think- Well, he got 150 years. I don't think that it mattered, but I mean, I guess- Agreed, but I think that if you look really closely at the law, these are all cases where it was assumed absolutely the RICO enterprise was criminal or illicit in nature. It would be contrary to the purpose of the statute. Now, I agree that you- The standard instruction from SAND, which is generally what we look to in this circuit, says, an enterprise includes any legal entity such as a partnership, corporation, or association. And then it goes on to describe non-legal entities that may also meet the definition. So your view is that that's a wrong instruction? My view is that- My view is this, that the instruction was proper in accordance with the way that instruction has been given throughout history in this district, and the United States Supreme Court in Boyle. What is problematic is that it is clear that the heart of the criminal- the purpose of this was illegal activity. That's what was charged. None of this evidence really went to promoting his brand or his music. All of the government's evidence allegedly went towards his illegal activity. So it's kind of disingenuous to say now, oh, well, we just needed to- There needs to be no nexus. We can just say that this was an organization that was out there promoting his music. And oh, by the way, there were- We can call it a RICO enterprise so long as Mr. Kelly is doing these criminal activities and relying on his, again, underlings, whether they know it or not, to facilitate it. And that, I think, is not what was contemplated by the framers of this statute. All right. Well, thank you both. Thank you. To a reserved decision.